BRUCE N. GRAHAM SBN: 89752
GRAHAM & ASSOCIATES
4505 LAS VIRGENES ROAD
SUITE 215
CALABASAS, CALIFORNIA
TEL.: 818-878-7600
FAX : 818-878-7601
E-MAIL: BGRAHAM107@AOL.COM

IN PRO PER and ATTORNEY FOR PLAINTIFF
FRANCES JEAN ACUNIS-GRAHAM

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCES JEAN ACUNIS-GRAHAM,<br>BRUCE N. GRAHAM<br>Plaintiffs,<br><br>vs.<br><br>SELECT PORTFOLIO SERVICING, INC.<br>Defendant | Case No.: 2:16-cv-8639<br><br>PLAINTIFF'S ORIGINAL COMPLAINT<br><br>JURY DEMANDED |

PLAINTIFFS FRANCES JEAN ACUNIS-GRAHAM and BRUCE N. GRAHAM allege:

**PRELIMINARY STATEMENT**

This action arises out of the servicing of a home mortgage by Select Portfolio Servicing, Inc. ("SPS") and the refusal of SPS to endorse an insurance check paid by Plaintiffs' homeowner insurer for the repair of a water loss in the Plaintiffs' home so that the insurance proceeds could be negotiated and the repairs commenced. Instead of complying with the terms of the loan which it claims to be servicing for the Plaintiffs' lender, SPS has fabricated multiple conditions which it insists that Plaintiffs comply as conditions precedent to obtaining the endorsement of SPS on the insurer's check and permitting Plaintiffs' to proceed with the repair of the residence. These burdensome and costly conditions are unauthorized by the controlling terms of the agreement

between Plaintiffs and the lender as memorialized by the Deed of Trust. In the process of its refusing to permit the Plaintiffs to commence repairs by endorsing the insurance check, SPS has breached the loan contract, breached the implied covenant of good faith and fair dealing in the loan they purport to be servicing, have committed and continue to commit violations of the California Consumers Legal Remedies Act ("CLRA") (California Civil Code Section 1770, et seq.), the California Unfair Competition Law ("UCL") (California Business and Professions Code Section 17200, et seq.), the Real Estate Settlement Practices Act ("RESPA") (12 USC Section 2601-2617), the Truth In Lending Act ("TILA")(15 USC Section 1641 (f0(2), the Fair Debt Collection Practices Act (FDCPA) (15 USC Section 1692-1692p). The breach of the mortgage has resulted in Plaintiff's being unable to make the repairs to their home and Plaintiffs seek damages for that breach of contract, the loss of the use of the home, and the now increased cost of repairing the home, and all other damages to which they are entitled to claim. Moreover, defendant has failed to comply with federal law by failing to investigate and correct its servicing errors and provide to Plaintiffs certain requested information. Plaintiffs also seeks damages and attorney fees for multiple violations of the Real Estate Settlement Procedures Act, 12 USC Section 2601 et seq ("RESPA") and the Truth In Lending Act, 15 USC Section 1601 et seq ("TILA").

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 USC Section 1331 (federal question).

2. Venue is proper here because the events giving rise to the causes of action of the Plaintiffs occurred in this district.

## THE PARTIES

3. Plaintiffs (sometimes referred to herein as the "borrowers") are adult residents of Los Angeles County, California.

4. On information and belief, Defendant SPS (sometimes referred to herein as the "servicer") is a corporation formed in Utah with its principal place of business in Utah.

## FACTUAL ALLEGATIONS

5. Plaintiffs are a 66 year old husband and wife who took out a mortgage ( sometimes referred to herein as "the first" or "First Loan") in 1991 with J. P. Morgan Chase Bank, NA, and AKA Chase Manhattan Financial Services, LLC ("Chase" or "Lender") to acquire the subject family residence for them and their children at 5449 Fremantle Lane, Calabasas, California (the "Property"). In 2003 they took out a Home Equity Line of Credit and Disclosure note with Washington Mutual Bank, NA (which was thereafter assigned to Chase when Chase acquired Washington Mutual Bank, NA, in or about 2008) to improve the Property (the "Second Loan"). These loan transactions are hereinafter collectively referred to as the "Loans." Each of the Loans were secured by separate deeds of trust on the Property.

6. On information and belief, on or about October 1, 2015, Chase assigned to SPS the right and duty to "service" the first. On information and belief, that in making that assignment SPS acquired no greater rights than as had been enjoyed by Chase under the first. Thereafter, SPS advised Plaintiffs that it had acquired the rights and duties to "service" the First Loan, but has at all times failed and refused to provide Plaintiffs with any corroboration of any such assignment or other documentation establishing the legal basis for its claimed interest in the First Loan, its claimed interest in the distribution of the insurance proceeds which are the subject matter of this action, or the legal basis for any of the oral and written assertions made to the Plaintiffs as hereinafter described. Regardless of any such assignment of the First Loan and/or any alleged assignment or right to "service" the First Loan as SPS claims to possesses, by statute, including, without limitation, RESPA, Section 2605(b)(3)(G) and the common law, SPS does not have any

rights to unilaterally modify the terms of the First Loan the rights of Plaintiffs (as "borrowers" under the First Loan) or the duties assumed by Chase under the First Loan, including but not limited to, the handling of the insurance proceeds to effect the repairs to the Property.

7. The Deed of Trust required that the property be insured for loss and, in particular, the first states, in relevant part:

> **Hazard Insurance**. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods which Lender requires. The insurance carrier providing the insurance shall be chosen by the Borrower subject to Lender's approval which shall not be unreasonably withheld.
>
> All insurance policies and renewals shall be acceptable to the Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and the Lender. Lender may make proof of loss if not made promptly by Borrower.
>
> Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess then due to Borrower. …

8. Plaintiffs have continually had the Property insured under a series of renewed homeowners' insurance policies issued by member companies of the Mercury Group of insurers (the "Policy") in full compliance with the foregoing provisions of the Deed of Trust, including protection against loss to the Property by fire and other hazards, together with the required "extended coverage"; coverage for amounts for what the lender required for loss to the dwelling, other structures, coverage for loss of use of the property; and a standard mortgage clause Form 372-NS (Nov 1950) (the "Mortgage Clause").

9. Under Mortgagee Clause, the lender on the First Loan is listed as the mortgagee and identified as a loss payee under the insurance policy protecting the Property and affords that lender the right to maintain that insurance, but otherwise affords that lender no other rights regarding control or affect how any insurance proceeds are spent, how such proceeds are spent, or under what conditions the Property may be repaired.

10. On information and belief, effective with the March, 4, 2015, to March 4, 2016, renewal of the Policy and without the knowledge, consent, or authorization of the Plaintiffs, SPS required the insurer under the Policy that SPS be named as the "Mortgagee" in place of Chase, and on further information and belief, the insurer complied with that request effective with that March 4, 2016, renewal of the Policy. That Policy remained in effect for the duration of the March 4, 2015, to March 4, 2016, policy period.

11. On or about December 15, 2015, Plaintiffs observed that a flooring area within the Property was wet and it was subsequently determined that a water line beneath the slab foundation had been leaking causing the accumulation of water, but no determination could be made regarding when the loss commenced or for how long the water had been leaking beneath the slab. The Plaintiffs reported the lost to the insurer under the Policy and retained a public adjustor ("Greenspan Public Adjustors") to assist them in the evaluation of the loss and the presentation of a claim to the insurer.

12. Investigations into the loss were conducted and necessary repairs were commenced, but during the course of repair certain floor tiles and wood paneling in the Property were damaged as a part of the need to expose the leaking pipe. Evaluations of the loss by both Greenspan Public Adjustors and the insurer under the Policy were made, and discussions had, about the extent of the damage to the Property and costs of repairing that damage. Certain documents were created reflecting those evaluations (hereinafter collectively referred to as

"Plaintiffs' Confidential Insurance Documents"). The full costs of repairing the damage to the dwelling resulting from the leaking pipe have not yet been determined and Plaintiffs fear that additional damage to the residence may result from the yet to be commenced repairs and result in further claims under the Policy.

13. On April 13, 2016, the insurer under the Policy issued a $142,133.66 check (the "Loss Check" or "Insurance Proceeds") payable to "Greenspan Public Adjustors, & Frances Graham & Bruce Graham & Select Portfolio Servicing Inc., and J. P. Morgan Chase."

14. On April 25, 2016, Plaintiffs contacted SPS to secure information as to where the Loss Check should be sent to secure the endorsement of SPS to that check. Plaintiffs were advised by "Sheila" of SPS that SPS required (among other things) that SPS control the insurance proceeds; that it would insist that the proceeds of the Loss Check be delivered to it; that SPS alone would decide how and when and how much of the insurance funds would be disbursed; that SPS would require that the repairs be performed by a licensed general contractor before any funds would be dispearsed; that SPS would require that the Plaintiffs surrender their rights of privacy and to provide the general contractor and SPS with the "insurance adjustor's worksheet;" that SPS would require that the Plaintiffs enter into a written contract with the licensed contractor for the repairs which the insurer had agree to cover; and that Plaintiffs would be obligated to comply with other "policies" which SPS and it alone chose to impose without regard to whatever "policies" which Plaintiffs chose to impose for the repair work.

15. Plaintiffs protested SPS' hereinbefore described demands and explained that they were quite competent to perform most (if not all) of the repairs themselve, such as the relaying of tile flooring, but "Sheila" representing SPS (without knowledge of the scope of damage or the nature of any repairs insisted that any such repairs had to be performed by a licensed contractor (that is, licensed by the California State Contractor's License Board); that Plaintiffs were barred

from repairing their own homes because they were not licensed by the California State Contractor's Licensing Board; and accused the Plaintiffs that if they did effect the repairs themselves that Plaintiffs would be in violation of California law because (according to SPS) a California homeowner could not legally repair their own home, and were barred from using their own employees to do the repairs, or directly contracting with others to do the repairs. "Sheila," on behalf of SPS, further promised that she would provide Plaintiffs a letter setting forth those and other conditions which SPS "required" as a condition of permitting the Plaintiffs to commence the repairs to their home.

16. On or about April 26, 2016, Greenspan Public Adjustors endorsed the Loss Check. J. P. Morgan Chase endorsed the Loss Check on or about April 28, 2016, explaining to Plaintiffs that Chase was "committed to helping you get your insurance funds as soon as possible so you can repair your home." Plaintiffs then forwarded the Loss Check to SPS and requested that it endorse the Loss Check and return it to Plaintiffs so that the repairs could be commenced.

17. On or about April 29, 2016, however, Plaintiffs received an unsigned, form letter from SPS's "Large Loss Dept." dated April 25, 2016, enclosing the unendorsed Loss Check and explaining that SPS was unilaterally imposing conditions on Plaintiffs and that SPS "required" as conditions precedent to permitting the Plaintiffs to use any of the proceeds of from the Loss Check to repair the Property, including that: 1) Plaintiffs must endorse the Loss Check and return the endorsed Loss Check to SPS; 2) that SPS would then endorse and negotiate the Loss Check; 3) that SPS would maintain custody of the insurance proceeds in an SPS account of its choosing; 4) that SPS and SPS would control the proceeds of the Loss Check; 5) that only SPS would determine when or if any portion of the Loss heck would be disbursed; 6) that SPS would alone make disbursements on conditions which it alone would decree; 6) that such disbursements would be made only if Plaintiffs first produced to SPS Greenspan Public Adjustors's "work sheet" (and

which is a document protected from disclosure by the California Insurance Information and Privacy Act found at Cal. Ins. Code Section 791, et seq., the California Constitution, Article 1, Section 1, and Plaintiff's common law rights of privacy); 7) that Plaintiffs produce for SPS a written agreement signed by Plaintiffs and a licensed contractor for the repairs detailing a list of the repairs to be made and specifying the money to be paid to the contractor for those repairs (although such a writing is protected from disclosure by the California Constitution, Article 1, Section 1, and Plaintiff's common law rights of privacy); 8) that the Plaintiffs secure and disclose the adjuster's "work sheet" to the licensed contractor doing the repairs and secure a written statement from that contractor confirming that he has seen what the insurer had agreed to pay for the repairs (thereby undermining the negotiating posture of the Plaintiffs to negotiate a price for the repairs with the contractor for a sum different from that which the insurer had authorized); 9) a written waiver of any lien by that general contractor (which included representations by that contractor that he had the financial ability to complete the repairs and that the contractor was making the specific repairs "as reported in the insurance adjuster's report"); 10) an IRS form W-9 for that licensed contractor (thereby precluding the Plaintiffs from utilizing the services of themselves or their own employees to effect repairs and for whom no W-9 is required or may be issued); 11) a copy of the contractor's license from the State Contractor's Licensing Board (thereby precluding Plaintiffs from utilizing the services of their own employees to do the repairs, or using unlicensed contractors to do repairs, or doing repairs themselves (although such alternatives to the use of a licensed contractor are usually far less expensive and the workers no less competent to effect the repairs as a licensed contractor); 12) and other unspecified proof to the satisfaction of SPS that the repairs have been completed as SPS in its lone judgment may determine.

18. In addition, SPS declared that no portion of the Loss Check could be used to cover the expenses incurred by the Plaintiffs in connection with their presentment of the claim to the

insurer including, without limitation, payment to their public adjuster notwithstanding the public adjuster's assistance in negotiating and securing the issuance of the Loss Check from the insurer. SPS demanded in its letter of April 25, 2016, that even if each of the before-described conditions which it sought to impose were satisfied, SPS may or may not agree to release all of the proceeds from the Loss Check.

19. By virtue of SPS' unilaterally imposed conditions precedents as hereinbefore described, SPS has dictated that it would all the proceeds from the Lost Check to be disbursed in an amount that it and it alone deems proper and that all required documents may have to be submitted for a second time followed by an inspection of the property by unknown persons selected by SPS before disbursements may be permitted by SPS, and that SPS may impose additional and add unknown conditions for the disbursements of the loss check.

20. Plaintiffs contacted SPS by phone on April 29, 2016, to discuss the issues set forth in April 25, 2016 form letter from SPS and spoke with "Jill" (purportedly a member of SPS' "Large Loss Team"). Plaintiffs again explained to SPS that notwithstanding the desire of Plaintiffs to reach an agreement for the resolution of the issues which SPS had raised in its telephone conversation of April 25 and letter of the same date, and although Plaintiffs assured SPS that they would agree to some reasonable conditions to insure that the property was repaired as required by the Deed of Trust, Plaintiffs could not agree to the terms which SPS sought to impose and that as the "servicer" of the First Loan for Chase its rights could be no greater than the lender on the First Loan had and that the only right it had was the right to insist that the Property be repaired or restored (something which Plaintiffs eagerly wished to do). Nor did Plaintiffs agree to modify the terms of the Deed of Trust.

21. During the course of the April 29, 2016 phone call, Plaintiff again demanded that SPS endorse the Loss Check, invited SPS to send its representatives to inspect the Property, and return a fully endorsed Loss Check to Plaintiffs. SPS refused Plaintiffs' demand.

22. By letter dated April 29, 2016, Plaintiffs demanded that SPS deliver any documentation which SPS claim supported it's claimed right to make the demands hereinbefore described and advised SPS that Plaintiffs would not agree to the conditions which SPS sought to impose and that (i) Plaintiffs intended to retain the right to act as their own contractor for some or all of the repairs to the Property as is their right under California Business and Professions Code Section 7044 and forego the use of a licensed contractor for some or all of the repairs; (ii) that the additional fees and costs incurred by the use of a licensed contractor (typically adding 10% profit and 10% overhead to the contract price) would increase the costs of the repairs in excess of the sums which the insurer was willing to pay, thereby inhibiting the ability of the Plaintiffs to effect the repair and restoration of the property; (iii) that the terms SPS insisted upon as conditions precedent to permitting Plaintiffs to proceed with the repairs to the property would require Plaintiffs to incur expenses for amounts which SPS would not reimburse the Plaintiffs, including an inflated price which they would have to pay a licensed contractor who had seen how much money the insurer was paying for the repairs and, therefore, how much Plaintiffs had available to pay for the repairs; (iv) that the Deed of Trust afforded the lender the right to inspect the Property as it may deem warranted upon reasonable notice to the Plaintiffs and that the lender (and/or SPS, if it was acting on behalf of the undisclosed lender) had no right (much less a justification) to obtain the adjustor's worksheet in order to determine the damage to the property; (v) that by implicitly mandating that the repairs which the insurer's worksheet envisioned be the same repairs performed by the licensed contractor, would undermine the ability of Plaintiffs to make repairs to the property in a manner which was different that the repairs envisioned by the insurer's work

sheet, although not undermining the value the property or the security for the first which the property provided; (vi) that the insurance adjuster's worksheet was a product (at least in part) of the evaluations which Plaintiff paid for through their public adjusters by the evaluations which were provided to the insurer by the public adjuster and whose fees and expenses are being borne by the Plaintiffs (and not SPS or the lenders) and that, therefore, SPS (who refuses to pay for the work of the public adjuster) would be unjustly enriched by being able to rely upon matters reflected in the adjustor's worksheet; and (vii) that SPS's refusal and failure to specify all of the terms under which it would release the funds would permit it to invent even more outrageous and legally meritless conditions on the release of the funds to the detriment of the Plaintiffs.

23. In apparent response to Plaintiffs letter of April 25, 2016, to SPS seeking further information as hereinbefore-described, on May 25, 2016, SPS sent to Plaintiffs a verbatim copy of the same unsigned form letter which it had previously sent (that is, a verbatim recitation of the same statements of the "steps" which SPS "required" of Plaintiffs) dated April 25, 2016. By letter dated May 31, 2016, Plaintiffs delivered the Loss Check which had been endorsed by Greenspan Public Adjusters and Chase and repeated their demand that SPS endorse and return that check or, in the alternative, that SPS set forth in writing the facts, law and justifications for its unfair business practices. The May 31, 2016 correspondence also provided SPS with a 30 day notice under CC Section 1782 that, unless the demands of Plaintiffs were accepted and performed by SPS, this suit would be filed.

24. Without responding to any of the requests for information as set forth in Plaintiffs' letter of May 31, 2016, SPS sent to Plaintiffs another unsigned form letter, dated June 25, 2016, returning the Loss Check without an endorsement from SPS "because the draft has not been properly endorsed."

25. The fair market value of the Property greatly exceeds the outstanding balances due on the First Loan and the Second Loan and to the extent that the Property constitutes security for the loans, the amount of that security is overwhelming protected and therefore there is no equitable basis for Plaintiffs to be required to comply with any of the conditions which SPS seeks to impose under the guise of protecting the legitimate interests of the lender of the First Loan.

26. On information and belief, and as partially evidenced by the treatment of Plaintiffs as hereinbefore described, SPS has a pattern and practice of ignoring its legal obligations under the loans it purports to "service"; of fabricating "steps" which it pretends it has the right to "require" of borrowers in preventing and delaying the use of insurance proceeds, of preventing or inhibiting the ability of borrowers from making repairs to their homes; of ignoring requests for information from borrowers under loans which it services; of misleading borrowers by claiming that borrowers must use licensed contractors to make repairs to their homes; and by engaging in unfair business practices including its business policy of requiring that SPS maintain custody of the insurance check proceeds pending the completion of the repairs (although there is no basis under the Deed of Trust for it to impose such a condition), of insisting that SPS and SPS alone will determine if, when, and under what circumstances any portion of the of the insurance check is released (although nothing in the Deed of Trust permits it to impose such conditions), of requiring borrowers like Plaintiffs to waive their rights under the California Insurance Information and Privacy Act (Insurance Code Section 791, et seq.,) and in doing the other things as herein alleged.

27. As a consequence of the foregoing, Plaintiffs have suffered emotional and economic damages in the loss of the insurance benefits, the loss of use of the property, the diminished value of the property, the increased cost of repairing that property, suffering the shame, embarrassment and humiliation of living in an unrepaired residence, incurring costs and expenses for interim repairs to the property, and other damages.

## FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT

28. Plaintiffs re-allege and incorporate herein paragraphs 1 through 27.

29. Plaintiffs have a loan which is owned and/or "serviced" by SPS.

30. On information and belief, SPS claims to be acting on behalf of and with the authority of the lender under the First Loan and, as a consequence, SPS' rights and duties under the First Loan are limited to the terms of the underlying loan as evidenced by the Deed of Trust which, in material part, provides that those rights are limited to requiring that the security for the loan (consisting of the Property) is not jeopardized, that that Property is to be repaired and restored with the proceeds of the Loss check for the subject loss, and the duties of SPS include not inhibiting or preventing Plaintiffs from proceeding with those repairs by the fabrication of "steps" which SPS requires of Plaintiffs as a condition of its endorsement of the insurance check.

31. SPS has breached those contractual duties in doing the things herein alleged, and by its refusal to endorse the insurance check, and by the doing of the other things herein above alleged.

32. As a direct, proximate, and legal result of the foregoing breaches by SPS Plaintiffs have suffered damages entitling them to compensation from SPS for the loss of their property.

## SECOND CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

33. Plaintiffs re-allege and incorporate herein paragraphs 1 through 25.

34. Plaintiffs' Second Loan with Chase which requires that Plaintiffs maintain and repair the Property as a condition of maintaining that line of credit. This is a valuable and advantageous business relationship which the Plaintiffs have enjoyed and under which they have legal rights.

35. SPS has knowledge of the Second Loan and advantageous business relationship which Plaintiffs and have with Chase. SPS is not a party to the Second Loan and is not a third

party beneficiary to the Second Loan. Furthermore, SPS has no beneficial or economic interest in the Second Loan.

36. SPS has intentionally and unjustifiably interfered with Plaintiffs' rights under the second by preventing and inhibiting the ability of Plaintiffs to repair and restore the Property as hereinbefore described herein.

37. As a direct, proximate, and legal result of the foregoing breaches by SPS Plaintiffs have suffered damages entitling them to compensation from SPS for the loss of their property.

## THIRD CAUSE OF ACTION FOR VIOLATION OF RESPA

38. Plaintiffs re-allege and incorporate herein paragraphs 1 through 37.

39. Section 6(d) of RESPA (12 USC Section 2605(e)) grants to borrowers the right to submit a "qualified written report" ("QWR") to a loan servicer requesting information and documents pertaining to the servicing of their loan. That provision also grants to borrowers the right to submit a notice of servicing error ("NOE") identifying the perceived error committed by the servicer. 12 USC Section 2605(e).

40. Recognizing the prevalence of servicing errors, the Consumer Finance Protection Bureau exercised its authority and clarified that borrowers have the right to have such errors corrected. 12 CFR Section 1024.35. Further, under Section 2605(e) and the implementing regulations ("Reg. X"), including the amendments thereto, servicers must provide a written acknowledgment of the correspondence within five days of the servicer's receipt of a QWR, within 30 days conduct a reasonable investigation of the errors identified in the borrowers notice and make all appropriate corrections to the account and provide the borrower with a written explanation of corrections made. the effect date of the corrections, and contact information for further assistance, and if the servicer determines that no error was committed, provide a written explanation of the reasons for its determinations, a right of the borrower to request the documents

relied upon by the servicer in reaching its determination, provide the borrower with contact for further information, or, if the servicer determines that it is no required to comply with these requirements then it must within five of its receipt of the QWR provide the borrower with written notice of that determination and detailing the reasons for that determination.

41. In addition, servicers are prohibited from taking timely action to respond to a borrower's notice of servicing errors relating to standard servicer's duties. 12 USC Section 2605(k)(C), failing to provide the borrower within ten days of a receipt of a request from a borrower the identity, address, and other relevant contact information about the owner or assignee of the loan (12 USC Section 2605(k)(D). Finally, servicers are prohibited from failing to comply with any other obligation imposed under the implementing regulations. 12 USC Section 2605(k)(E).

42. The first is a "federally regulated mortgage" within the meaning of 12 USC Section 2602(1).

43. SPS is a "servicer" within the meaning of 12 USC Section 2605(i)(2).

44. Plaintiffs' letters of April 29, 2016, and May 31, 2016, jointly and severally constituted a QWR and NOE within the meaning of 12 USC Section 2605(e) and Reg. X.

45. SPS violated the foregoing laws by falling to respond to the QWR and NOE of Plaintiffs as required by that statute; by failing to undertake any investigation of the errors referred to in the QWRs; by failing to endorse the insurance check and release the funds which SPS was refusing to release; and by failing to take timely action to respond to Plaintiffs, and in doing other things.

46. Plaintiffs have suffered actual damages as a proximate result of the failure of SPS to comply with Section 2605(e).

## FOURTH CAUSE OF ACTION FOR VIOLATION OF CALIFORNIA CIVIL CODE SECTION 1770(a)(14)

47. Plaintiffs re-allege and incorporate herein paragraphs 1 through 46.

48. The acts and omissions of SPS as alleged herein constitute unfair and deceptive acts and practices in that SPS has made representations that the loan transaction confers upon it rights to which it is not entitled to claim.

49. In addition to the damages as hereinabove alleged, Plaintiffs are entitled to trebled damages pursuant to Civil Code Section 1780.

## FIFTH CAUSE OF ACTION FOR CONVERSION

50. Plaintiffs re-allege and incorporate herein paragraphs 1 through 49.

51. At all times material to this matter, SPS has continually prevented Plaintiffs from having access to the proceeds of the Loss check.

52. Plaintiffs have not consented to the actions of SPS.

53. Plaintiffs have suffered damages as a consequence of the acts and omissions of SPS and have been harmed by the conversion of the insurance proceeds by SPS and the conduct of SPS was a substantial factor in causing Plaintiff's harm.

## SIXTH CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENENT OF GOOD FAITH AND FAIR DEALING

54. Plaintiffs re-allege and incorporate herein paragraphs 1 through 53.

55. There existed under the First Loan and under the Deed of Trust an implied covenant of good faith and fair dealing that neither party would do anything to injure the other's rights to receive the benefits of the loan, including the property insurance required by the loan.

56. SPS breached that implied covenant of good faith and fair dealing by doing the things alleged herein.

57. As a consequence of the foregoing, Plaintiffs have suffered damages.

## SEVENTH CAUSE OF ACTION FOR DECLARATORY RELIEF

58. Plaintiffs re-allege and incorporate herein paragraphs 1 through 57.

59. There exists a real and justiciable controversy between and among the parties in that SPS claims that it is entitled to extort concessions from the Plaintiffs by exacting conditions for the repair of the Property which it may not claim under the Deed of Trust, including those alleged herein. Plaintiffs, on the other hand, contend that SPS has no such rights and that any rights of SPS which it may legitimately claim arising from any assignment of the First Loan or any contractual arrangement it may claim to have with from Chase to service the First Loan are limited to the rights which Chase has under the Deed of Trust which do not include any of the rights which SPS is presently claiming as hereinabove alleged.

60. Plaintiffs seek a judicial declaration from the Court declaring and establishing such rights duties of the parties and an order requiring SPS to endorse the Loss Check (along with any other such checks as may be issued by the insurer for the repairs) and returning to Plaintiffs the endorsed checks and prohibiting SPS from further interfering with the Plaintiffs and their efforts to repair the property.

Wherefore, Plaintiffs pray for this Court's Judgment, as follows:

1. For general damages according to proof;
2. For special damages according to proof;
3. For injunctive relief requiring SPS to endorse the Loss Check and any other loss payment checks which may be issued by the insurer and to return such endorsed checks to the Plaintiffs and to prohibit it from further interfering in the repairs of the residence;
4. For $5000 statutory damages under Civil Code Section 1780:
5. For trebled damages under California Civil Code Section 1780;
6. For attorney fees;

7. For prejudgment interest;

8. For this Court's declaration and decreeing that SPS has no basis to refuse and release the proceeds from the Loss Check to Plaintiffs (or any subsequently issued insurance checks); and

9. For such further relief as the Court may deem just.

Date: November 18, 2016

GRAHAM & ASSOCIATES

By:________________________

BRUCE N. GRAHAM

**DECLARATION OF BRUCE N. GRAHAM**

I, Bruce N. Graham, declare:

1. I am counsel of record representing my wife in this matter and I am representing myself as an *in pro per* plaintiff. The things stated herein are of my personal knowledge and if called to testify I would testify to the following facts.
2. This declaration is offered to satisfy the requirements of California Civil Code Section 1780.
3. This action has been filed in Los Angeles County and which is a proper county for the trial of this action because the transactions which are involved in this matter all arose in Los Angeles county.

I declare under penalty of perjury that the foregoing is true and correct.

Date: November 18, 2016

________________________

Bruce N. Graham